IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANNIA

ALLEGHENY LUDLUM, LLC,

*Plaintiff,*

v.

LIBERTY MUTUAL INSURANCE
COMPANY et. al.,

*Defendants.*

Civil Action No. 2:17-cv-1243-WSS

Hon. William S. Stickman IV

## OPINION

WILLIAM S. STICKMAN IV, District Judge

This is an insurance dispute about whether Defendants owed coverage to Plaintiff for an underlying toxic tort action.  There are seven pending cross-motions for summary judgment filed by Plaintiff Allegheny Ludlum, LLC ("Allegheny") and Defendants Liberty Mutual Insurance Company, Liberty Mutual Fire Insurance Company (collectively "Liberty Mutual"), Continental Casualty Company ("Continental"), United States Fidelity and Guaranty Company ("USF&G"), Hartford Casualty Insurance Company, and Hartford Accident and Indemnity Company (collectively "Hartford").  (ECF No. 132); (ECF No. 136); (ECF No. 140); (ECF No. 144); (ECF No. 148); (ECF No. 150); (ECF No. 152).  The Court considered all the relevant filings and representations made at oral argument.  For the reasons set forth below, the Court holds that all Defendants are entitled to summary judgment in their favor.  This case is, therefore, dismissed.

### FACTUAL BACKGROUND

Arvin-Meritor, Inc. ("Arvin Meritor") operated an automobile muffler manufacturing facility from 1964 to 2002 in Fayette, Alabama.  (ECF No. 1 at p. 4).  Some of the products used

in its facility were bought from Allegheny, a manufacturing company based in Pittsburgh, Pennsylvania. Allegheny took out insurance policies with four insurers during the relevant period: Hartford from July 1, 1982 to July 1, 1985; Liberty Mutual from July 1, 1985 to November 1, 1998; Continental from November 1, 1997 to November 1, 2000; and USF&G from November 1, 2000 to November 1, 2002. *E.g.*, (ECF No. 1-17); (ECF No. 1-3); (ECF No. 1-10); (ECF No. 1-21); (ECF No. 1-22). In 2003, former employees of Arvin Meritor filed a toxic tort action referred to as the *Bell-Carr* litigation. Their complaint raised several claims, including wantonness. ECF No. 1 at p.4. They amended their complaint for the first time on May 6, 2005 by adding new defendants, including Allegheny. (ECF No. 1-25 at p. 3).

Between June 2005 and June 2011, the Supreme Court of Alabama adjudicated several statute of limitations issues arising from, or at least pertinent to, the *Bell-Carr* litigation. In 2007, the Alabama Supreme Court held that claims against new defendants did not relate to the filing date of the original complaint for statute of limitations purposes. *Ex parte Int'l Ref. & Mfg. Co.*, 972 So. 2d 784, 791 (Ala. 2007). Plaintiffs reacted by filing a second amended one-count complaint against Allegheny seeking compensatory damages for wantonness. (ECF No. 1 at p. 5). On January 16, 2009, the Supreme Court of Alabama held that a six-year limitations period applied to *Bell-Carr* plaintiffs' wantonness claim. *Bell Carr, Jr., et al. v. Int'l Refining & Mfg. Co. d/b/a/ Irmco, et al.*, 13 So.3d 947, 955 (Ala. 2009). This holding dismissed all plaintiffs whose injuries occurred exclusively before May 6, 1999. After this point, the parties treated May 1999 to May 2002 as the operative limitations period. One month later, plaintiffs issued a settlement position statement stating that the time period for wantonness claims was from 1999 to 2002. On June 30, 2011, the Alabama Supreme Court held that a plaintiff injured by exposure to a toxic substance is

limited to recovering damages within the statute of limitations period.   *Jerkins v. Lincoln Elec. Co.*, 103 So. 3d 1, 7–8 (Ala. 2011).

On September 14, 2010, Liberty Mutual and Hartford held a teleconference with Allegheny.   The next day, Allegheny's Senior Director of Risk Management, Colleen Hannegan, sent a follow-up email to Defendants discussing the applicability of the Alabama Supreme Court's 2009 decision in *Carr*. Allegheny's position at that time was that Liberty Mutual and Hartford owed no coverage.   In 2013, Liberty Mutual and Hartford negotiated a cost-share limited to Allegheny's pre-2009 defense costs.   In 2016, however, Allegheny purportedly "discovered" that it incorrectly interpreted *Carr*, and consequently erred in negotiating the 2013 cost-share. Allegheny ultimately settled the underlying litigation in 2017, but changed its position on the issue of whether its insurers owed coverage.   When all four insurers denied coverage, Allegheny sued. Its four-count Complaint, filed on September 25, 2017, requests declaratory judgment and alleges failure to defend and bad faith.   (ECF No. 1 at pp. 8–11).

## STANDARD OF REVIEW

Summary judgment is warranted if the Court is satisfied that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.[1]   Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Cattrett*, 477 U.S. 317, 322 (1986).   A fact is material if its adjudication is necessary to the disposition of a substantive claim or defense.   In other words, there is a genuine dispute of material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   The Court must view the evidence presented in the light most favorable to the nonmoving

---

[1] A motion for partial summary judgment is reviewed under the same standard as a motion for full summary judgment. *Pettengill v. United States*, 867 F. Supp. 380, 381 (E.D. Va. 1994).

party. *Id.* at 255. It refrains from making credibility determinations or weighing evidence. *Id.* "Real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof," will defeat a motion for summary judgment. *El v. Se Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir. 2007).

## ANALYSIS

The pending motions for summary judgment raise related issues and will be examined together. The motions of Liberty Mutual and Hartford raise similar issues relating to the statutes of limitations on Allegheny's coverage claims and bad faith claims. They will be analyzed together. Likewise, the arguments of Continental and USF&G lend themselves be being considered together. Having thoroughly weighed all of the parties' respective positions, the Court will grant summary judgment in favor of all Defendants.

## I.     Liberty Mutual and Hartford

The Court will combine its analysis of both sets of cross-motions for summary judgment filed by Liberty Mutual, Hartford, and Allegheny because they involve common issues centering around the statutes of limitations governing Allegheny's coverage and bad faith claims. The Court holds that all of Allegheny's claims against Liberty Mutual and Hartford are time-barred.

### A.  Counts 1 and 2: Declaratory Judgment

Liberty Mutual and Hartford argue that the Court should grant summary judgment against Allegheny's counts for declaratory judgment because they were untimely under Pennsylvania's statute of limitations: 42 Pa. C.S.A. § 5525(a)(08). The statutory period under Section 5525 for declaratory judgment actions and breach of contract claims is four years. The statutory period begins to run when a claim accrues. So, when does such a claim accrue? That is the dispositive

question for this issue. The parties proffer different theories, each backed by their own purportedly controlling case.

Until relatively recently, there was little caselaw on when a claim accrues, and the statutory period begins to run in declaratory judgment actions seeking insurance coverage. Allegheny argues that the statute of limitations does not run until the termination of the underlying litigation, not the date that coverage was disclaimed by the insurer. It bases its argument on the Honorable Joy Flowers Conti's decision adopting the Report and Recommendation of United States Magistrate Judge Lisa Pupo Lenihan in *Wiseman Oil Co., Inc. v. TIG Ins. Co.*, 878 F. Supp. 2d 597, 601–02, 604 (W.D. Pa. 2012) ("As Plaintiffs' cause of action for breach of the duty to defend accrued—i.e., its right of action was complete—when the Underlying Litigation was terminated and the defense costs were fixed, this claim and Plaintiffs' corresponding declaratory judgment claim are within the applicable statute of limitations." (citing *Moffat v. Metro. Cas. Ins. Co. of N.Y.*, 238 F. Supp. 165, 175 (M.D. Pa. 1964))). Judge Conti purported to apply Pennsylvania law, but recognized the dearth of authority and qualified her opinion by saying that her interpretation had "not [yet] been controverted by the Pennsylvania Court and its reasoning that 'the right of action is complete' only after there is a final judgment against the insured has become the clear majority rule.'" (citing, as persuasive authority, case law from other forums)).

The qualifying language in *Wiseman* is essential to this case, as the winds of change blew against that interpretation in 2015. In that year, the Pennsylvania Superior Court, sitting *en banc*, handed down its decision in *Selective Way Ins. Co. v. Hosp. Grp., Serv.'s, Inc.*, 119 A.3d 1035 (Pa. Super. 2015) (*en banc*). The Superior Court determined that the point of accrual for the statute of limitations on an insurer's request for a declaration that no coverage is owed was when an insurer has a sufficient factual basis to support its claim that there is no coverage. *Id.* at 1051. The

Superior Court accordingly held that the action before it was improperly dismissed under the statute of limitations because the trial court made no assessment of when the insurer had sufficient information to conclude that it did not owe a duty of coverage.

Significantly, the Superior Court did not base its decision on a rule specific to coverage disputes, but rather, applied general rules regarding the accrual of claims. It explained that "a cause of action accrues when the plaintiff could have first maintained the action to a successful conclusion." *Selective*, 119 A.3d at 1047. The Court held that a claim could accrue when the insurer denies coverage. *Id.* at 1048 ("The denial of coverage certainly **could** be when an actual controversy arises between an insurance company and an insured, warranting the filing of a declaratory judgment action.") However, the claim may accrue even earlier—such as when an insurer receives a complaint against the insured. *Id.* at 1050. Thus, the Superior Court held that the triggering event for the limitations period on a coverage declaratory judgment action was the moment that the insured had sufficient facts to support its claim that it does not owe coverage. *Id.* at 1051.

Allegheny attempts to distinguish *Selective* by arguing that it applies only to actions brought *by*, rather than against, insurers. This distinction cannot hold. Two years after *Selective*, a three-judge panel of the Superior Court applied *Selective's* rule of law to a declaratory judgment action begun against an insurer by a party seeking coverage. *Green v. Pa. Prop. & Cas. Ins. Guar. Assoc.*, 158 A.3d 653 (Pa. Super. 2017).[2] The Superior Court panel looked to the rule it enunciated in *Selective* as controlling, and explained as follows:

> [w]e distill several relevant principles from our decision in Selective Way. First, declaratory judgment actions are subject to a four-year limitations period under

---

[2] The plaintiff in *Green* was a judgment creditor of a nightclub where he was injured in a shooting incident. Plaintiff and the judgment debtor had both sought, and been denied, coverage for the incident.

Pennsylvania law.  Second, this limitations period begins to run when a cause of action accrues. Third, a cause of action for declaratory judgment accrues when an actual controversy exists and an actual controversy exists only where a case presents clearly antagonistic positions or claims indicating imminent and inevitable litigation.

*Green*, 158 A.3d at 660.

An examination of both *Selective* and *Green* shows that there is no bright-line rule as to when the statute of limitations will begin to run in a coverage action.  Rather, they look to the general concept of when a cause of action accrues.  A cause of action accrues "when an actual controversy exists." *Id.* at 660.  Indeed, as per *Selective*, the statute of limitations begins <u>as soon</u> <u>as</u> the "plaintiff could have first maintained the action to a successful conclusion." *Selective*, 119 A.3d at 1047.  The Superior Court's decisions do not support the bright line rule, as espoused in *Wiseman*, that the statute of limitations will not begin to run in a coverage action until the conclusion of underlying litigation.[3]  Rather, according to the Superior Court, the limitations period will begin to run as soon as the circumstances would permit a plaintiff to maintain an action.  While, at times, this could be the conclusion of the underlying action, that may not be the case in all circumstances.  Where, as here, there was a disclaimer of coverage *before* the conclusion of litigation that would *permit* a party to bring an action, under the *Selective* analysis, the statute will have begun to run, notwithstanding the status of underlying litigation.

The Court must follow the rule announced in *Selective*.  As a federal district court sitting in diversity in Pennsylvania, this Court is obligated to follow the decisions of the Pennsylvania

---

[3]  The *Selective* Court recognized that, although the duty to defend and the duty to indemnify are separate duties which, technically, may arise at different times, for purposes of the statute of limitations analysis. *Id.* at 1049 ("Nonetheless, for the purposes of determining the triggering event for the commencement of the statute of limitations to file a declaratory judgment action, we cannot disentangle the duty to defend because both relate to the question of whether the policy provides coverage.").

Supreme Court. *McKenna v. Ortho. Pharma Corp.*, 622 F.2d 657, 661 & n.14 (3d Cir. 1980). Without a decision from the Pennsylvania Supreme Court on point, the Court must engage in a so-called *Erie*-guess to determine what the Pennsylvania Supreme Court would do if it was in a federal court's shoes. *Gullborg v. Rizzo,* 331 F.2d 557, 558 (3d Cir. 1964). The United States Supreme Court commands this Court to heed uncontested decisions of the Pennsylvania Superior Court and Commonwealth Court as binding precedent when engaging in an *Erie*-guess. *W. v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236–37 (1940) ("Where an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citing cases)); *see also C.I.R. v. Bosch's Estate*, 387 U.S. 456, 464–65 (1967). Although the opinions of other state courts and federal courts applying Pennsylvania law are helpful, they are merely persuasive authorities. *Am. Tel. & Tel. Co.*, 311 U.S. at 236–37. In this case the Court is bound to follow the rule of law announced by *Selective*, for not only is that rule undisputed, it was announced *en banc*. It represents the consensus not merely of one particular panel, but that of the entire Superior Court. Bar outright reversal by the Pennsylvania Supreme Court or dicta to the effect that it might do so in the future, *Selective's* rule must be applied in this Court.

Hartford and Liberty Mutual denied coverage in 2010. This is the point at which Allegheny had a sufficient factual basis to conclude that they did not intend to provide coverage. Critically, all relevant parties agreed on this issue as of 2010, a point of fact illustrated by their September 14, 2010 teleconference and follow-up communiques. *See, e.g.*, (ECF No. 134-2 at p. 19); (ECF No. 134-2 at pp. 22–23); (ECF No. 134-3 at pp. 9–11, 13–15, 17–23, 25–27); (ECF No. 147-2 at pp. 2–5). There can be no greater guarantee against the potential of a claim falling within an

insurance policy than when an insured itself takes the position that coverage is not obliged. *Cf. Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 2 A.3d 526, 609 (Pa. 2010) ("Accordingly, it is the potential, rather than the certainty, of a claim falling within the insurance policy that triggers the insurer's duty to defend."). At the latest, the September 14, 2010 teleconference was the accrual point for the statute of limitations.

Allegheny offers two rebuttals that the Court will address. First, Allegheny suggested at oral argument that the law-of-the-case doctrine vindicates its position. The accrual point could not have run from September 2010, so it said, because a of decision in the underlying litigation issued as recently as 2017 holding that Allegheny was potentially liable for pre-1999 injuries and damages, so its insurers remain on the hook. (ECF No. 163 at pp. 3–4, 8–10, 18–19). This argument is a red herring. The law-of-the-case doctrine only prohibits this Court from re-adjudicating the decisions of coordinate courts, not a decision of a state court in litigation underlying an insurance dispute in federal court. *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988) (citing cases). Moreover, the law of the case doctrine applies only to the issues in the underlying case, not how those issues impact the coverage determinations at issue here.

Second, Allegheny tries to cast the "may be" language in a coverage position letter sent by Hartford on December 29, 2010 as evidence that there was uncertainty at that time about whether there was potential for liability for Hartford, and perhaps for Liberty Mutual too. That view, however, is mistaken. The relevant language, found in the letter's introduction, states that "The Hartford agrees, pursuant to a full reservation of rights, to participate in the defense of ALC in connection with the Lawsuit. However, it has been determined that there may be no indemnity coverage available for the Lawsuit under the Policies for the reason set forth below." (ECF No.

147-2, p. 3).  Contractual language should not be interpreted in isolation but must be read with reference to the context in which it appears.  *Cf. A.S. v. Pa. State Police*, 143 A.3d 896, 906 (Pa. 2016) (discussing the context canon of statutory interpretation).  The relevant language here, taken in the context of the letter as a whole, clearly and unambiguously denied coverage.  Section II of the letter expresses Hartford's interpretation of the September 14, 2010 teleconference meeting as limiting Hartford's liability for wantonness to the period between 1998 until 2002 and that any exposure before 1998 was barred by the statute of limitations per the Alabama Supreme Court's decision in *Carr*.  Indeed, the title of Section II is "Indemnity Denial."  Not "Potential Indemnity Denial," "Conditional Indemnity Denial," or anything else to that effect.  Despite the letter's request that Hartford be immediately advised if its understanding of *Carr* or the teleconference was incorrect, Allegheny did not change its position until much later.  *See* (ECF No. 147-2 at pp. 2–5).  Too late, in fact.  The statute of limitations expired in 2014, three years before this suit was filed.  The Court holds that Allegheny's request for declaratory relief is time-barred as a matter of law.[4]

### B.  Count 3: Breach of Contract/Duty to Defend

Liberty Mutual and Hartford argue that the Court should also grant summary judgment on Count 3, Allegheny's breach of contract claim on the duty to defend.  As explained above, the statute of limitations for a breach of contract and a declaratory judgment action is the same—four years. 42 Pa. C.S.A. § 5525(a)(8).  Further, the Superior Court's decision in *Selective* was not based on an analysis specific to declaratory judgment actions, but rather, on the general principles governing the accrual of claims.  The same principles apply to the analysis of Count 3 as at Counts

---

[4] Neither Liberty Mutual nor Hartford needed to file a declaratory judgment action prior to refusing to defend or indemnify Allegheny. *See Selective*, 119 A.3d at 1052.

1 and 2.  Both Liberty Mutual and Hartford denied coverage to Allegheny in 2010, long before this action was filed.   It was then that Allegheny could have first maintained an action.  It was then that its claim accrued, and the statute of limitations began to run.  As such, Liberty Mutual and Hartford's Motions for Summary Judgment will be granted.

### C.  Count 4: Bad Faith

Allegheny alleges that Liberty Mutual and Hartford committed bad faith under 42 C.S.A. § 8371 and Pennsylvania common law by failing to correct the latter's purportedly mistaken interpretation of Alabama law guiding the September 14, 2010 teleconference.  Liberty Mutual and Hartford disagree.  This count turns on another statute of limitations issue.  A two-year statute of limitations applies to the statutory bad faith claim; a four-year period of limitations applies to the common law bad faith claim.[5]  *See* 42 C.S.A. § 8371; *see also Ash. v. Cont. Ins. Co.*, 932 A.2d 877, 882, 884 (Pa. 2007).  The alleged bad faith occurred in September 2010, but Allegheny did not sue until September 2017.   Allegheny seeks to escape summary judgment at this stage by advancing the blanket argument that a bad faith claim "is simply not the sort of claim that can be decided as a matter of law. . . ."  There is no precedent cited in support of this blanket statement. If there are no disputes of material fact, then judgment can be granted as a matter of law.  And that is precisely what the Court will do here because the statute of limitations issue does not require a credibility determination.

Statutes of limitations for bad faith claims run when an insurer clearly and unequivocally denies coverage.  *Adamski v. Allstate Ins. Co.*, 738 A.2d 1033, 1042–43 (Pa. Super. 1999).  As

---

[5] After the promulgation of the Pennsylvania bad faith statute, Pennsylvania no longer recognizes a common law remedy for bad faith against insurance companies.  *See Johnson v. Progressive Insurance Company*, 987 A.2d 781 (Pa. Super. 2009).  As Hartford notes, a common law bath faith claim sounds in contract under Pennsylvania law.  (ECF No. 145, pp. 19-20).

established above, *supra* Part I.A., that point in time was in 2010.  Both statutes of limitations ran long before the case was filed.  Allegheny cannot sidestep this conclusion on the theory that there were "continuing" acts of bad faith, for the Pennsylvania Superior Court rejects the "continuing violation" theory.  *Id.* at 1041–42.  The Court holds that Allegheny's bad faith count is time-barred as a matter of law.

## II.      Continental and USF&G

The Court combines its analyses of both sets of cross-motions for summary judgment filed by Continental, USF&G, and Allegheny here because they involve issues common to both Defendants: duties to defend and indemnify.  There are also discrete issues specific to each Defendant—the deductibles under Continental's policy and the pollution exclusion under USF&G's policy.  For the reasons set forth below, the Court will grant Continental's and USF&G's motions for summary judgment.

### A.  Duties to Defend and Indemnify

The parties dispute whether the wantonness claim against Allegheny in the *Bell-Carr* litigation triggers liability under Continental's and USF&G's policies.  Allegheny was insured under the Continental policy between November 1, 1998 and November 1, 2000.  Allegheny was insured under the USF&G policy between November 1, 2000 and November 1, 2002.  These policies must be interpreted according to their plain and ordinary meaning; where they are ambiguous, they must be construed in favor of the insured.  *See Jacobs Constr.'s, Inc. v. NPS Energy Serv.'s, Inc.*, 264 F.3d 365, 376 (3d Cir. 2001) (citing cases).  The goal of interpreting an insurance policy is to establish the parties' intentions.  *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (citing *401 Fourth St. v. Investors Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005)).

The dispute turns on how the Court unpacks a matryoshka doll of insurance tort terminologies. Continental's and USF&G's policies state that they cover bodily injuries and property damage if they are caused by an "occurrence" taking place in the "policy territory." (ECF No. 1-21 at p. 7); (ECF No. 1-22 at p. 23). The term "occurrence" in both policies is defined as an "accident, including losses caused by continuous or repeated exposure to the same harmful conditions." (ECF No. 1-21 at p. 17); (ECF No. 1-22 at p. 34). Though the term "accident" is at the heart of whether Defendants' duty to defend or indemnify terminated, it is undefined in the policy. It is a well-established canon of contract interpretation that undefined terms are afforded their plain meaning as set forth in the dictionary. *Aleynikov v. Goldman Sachs Group, Inc.*, 765 F.3d 350, 360 (3d. Cir. 2018) ("dictionaries are the customary reference source that a reasonable person in the position of a party to a contract would use to ascertain the ordinary meaning of words not defined in the contract." (citation omitted)). Black's Law Dictionary defines "accident" as: "An unintended and unforeseen injurious occurrence; something that does not occur in the usual course of events or that could not be reasonably anticipated; any unwanted or harmful event occurring suddenly, as a collision, spill, fall or the like, irrespective of cause of blame." BLACK'S LAW DICTIONARY (11th Ed. 2019). The Oxford Dictionary defines accident as: "1. an unexpected and unpleasant event. 2. An event that is unforeseen or has no apparent cause." OXFORD ENGLISH DICTIONARY OF CURRENT ENGLISH (3d. Ed. 2008). The key to both dictionaries' treatment of "accident" is the unexpected or unforeseen nature of the event.

The definition of the term "occurrence" here is the same as that used in the policy at issue in *Kvaerner*. *Kvaerner Metals*, 908 A.2d at 332. In *Kvaerner*, the Pennsylvania Supreme Court rejected the contention that faulty workmanship on a coke battery could be deemed an "accident" so as to constitute an "occurrence" under the policy. The Court acknowledged that "accident" was

undefined in the policy. It looked for guidance to WEBSTER'S NEW COLLEGE DICTIONARY, which defined "accident" as "an unexpected and undesirable event," unexpectedness being the key to the term's meaning. Thus, the term "accident" implies "a degree of fortuity that is not present in a claim for faulty workmanship." *Id*. at 333-36.

Allegheny's position fails because no "accident" was the subject of the underlying claim against it in the *Bell-Carr* litigation. In their second amended complaint the plaintiffs in the *Bell-Carr* litigation alleged wantonness. Wantonness is defined by Alabama courts as "the conscious doing of some act or the omission of some duty while knowing of the existing conditions *and* being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Ex parte Essary*, 992 So. 2d 5, 9 (Ala. 2007) (citing *Bozeman v. Cent. Bank of the S.*, 646 So. 2d 601 (Ala. 1994)). The Alabama Supreme Court declared in 2007 that the term "conscious" is not coextensive with specific intent; rather, it means "having an awareness of one's own existence sensations, and thoughts, and of one's environment." *Id*. (citing *Berry v. Fife*, 590 So. 2d 884, 885 (Ala. 1991)). On the other hand, wantonness is a qualitatively different tort concept than negligence. *Id*. The Alabama Supreme Court likens wantonness to recklessness. *Ex parte Capstone Bldg. Corp.*, 96 So.3d 77, 86 (Ala. 2012).

The disposition of Continental and USF&G's motions hinges on whether the wantonness asserted below in relation to the exposure of the underlying plaintiffs to toxic chemicals can, as a matter of law, constitute an "accident," as those terms are defined in relevant case law and by the drafters of the policy. The Court thinks not. The plaintiffs in the *Bell-Carr* litigation did not allege negligence in their second amended complaint—they alleged willful/wanton conduct. The factual basis for this allegation was that the injuries inflicted on the plaintiffs through exposure to toxic chemicals and fumes were the natural, expected, and foreseeable result of Allegheny's conscious

conduct. Defendants' policies do not, in the Court's view, cover Allegheny's damages because there is no controlling precedent or language in the policies themselves suggesting that "willful or wanton conduct" can be considered "accidental." *Cf. Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388 (3d Cir. 2016) (holding that injury caused by receipt of junk faxes are the "natural and expected result of the intentional sending of faxes, a far cry from Pennsylvania's definition of an 'accident.'"). Equating reckless or wanton conduct with "unexpected results," a counterintuitive inference from the Court's point of view, without any clear authority is a bridge too far. Prudence demands a disciplined and reserved approach here, especially in light of the fact that the Alabama Supreme Court has been so careful in delineating the boundary between specific intent and recklessness. *See Ex parte Capestone Bldg. Corp.*, 96 So. 3d at 86. The Court holds that Allegheny's wantonness claim does not trigger liability under Continental's and USF&G's policies as a matter of law. That cause of action does not contemplate an "accident" as defined under the policy, therefore, the exposure to toxic fumes at issue here did not constitute an "occurrence" under the terms of the policy either.

### B. Deductibles Under the Continental Policy

In the alternative that there was an "accident," and therefore an "occurrence" within the scope of the policy, Continental insists that it can escape liability because Allegheny's settlement payment did not exceed the minimum deductible threshold. The Continental policy had a $2M occurrence limit. *E.g.*, (ECF No. 1-21 at p. 2). That limit applied to two intervals: November 1, 1998 to November 1, 1999 and November 1, 1999 to November 1, 2000. Each occurrence limit was subject to a $1M deductible. *E.g.*, (ECF No. 1-21 at p. 78). The total settlement payment in 2017 was $1.3M and defenses costs were about $3M. Continental argues that because Allegheny did not satisfy the $2M deductible requirement, Continental's obligations to pay under the policy

terminated.  Allegheny disagrees, arguing that Continental is jointly and severally liable for $1M of Allegheny's indemnity cost and 76.9% of its unreimbursed costs.  It all comes down to whether defense expenses count towards satisfying the aggregate limit under the liability conditions of the Continental policy.  If the answer is clearly "Yes," Continental is entitled summary judgment.  But if the policy language is ambiguous, Allegheny wins under the doctrine of *contra proferentem* and Continental must pay.  The Court finds that Continental has a stronger position.

The solution to this conundrum lies in the language found in the Continental policies' deductible endorsement and claim services agreement.  The sixth paragraph of the deductible endorsement, for example, sets the contours of Continental's obligations:

> We have no obligation to pay or contribute to any allocated claim expenses unless a claim payment exceeds the deductible in which case we will pay allocated claim expenses in the ratio which the amount we pay as damages bears to the total amount paid as damages with respect to an occurrence.

(ECF No. 1-21 at p. 78, ¶ 6).  The plain and ordinary meaning of the phrase "claim payment" is clear when contrasted with the phrase "claim expenses."  The former phrase is narrower.  The latter phrase, as defined in paragraph six, is broader: "Allocated claim expenses shall include . . . fees and expenses, fees for services or process, fees to attorneys. . . ." *Id.* at p. 79, ¶ 6.

The contract could have been drafted in at least two different ways.  First, the sixth paragraph easily could have been drafted to affirmatively say that costs toll towards the deductible threshold, for example, "We have no obligation to pay or contribute to any allocated claim expenses unless a claim payment and expenses exceeds the deductible."  In that alternative, Allegheny would prevail.  Second, had the contract been completely silent, Allegheny would still prevail.  As the Pennsylvania Supreme Court wrote in *Jerry's Sport Ctr., Inc.*, 2 A.3d at 544, "Where the insurance contract is silent about the insurer's right to reimbursement of defense costs,

permitting reimbursement for costs the insurer spent exercising its right and duty to defend potentially covered claims prior to a court's determination of coverage would be inconsistent with Pennsylvania law." But the language that was actually employed in the policy unambiguously aligns with Defendants' interpretation.

Just because disputed language could have been drafted more clearly does not necessarily mean that it is ambiguous. The narrower term "claim payment" implies that costs do not count towards the minimum deductible threshold. In light of that determination, the Court must conclude that the payment of $1.3M did not hit the $2M tipping point. So even in the alternative that there was an "accident," and therefore an "occurrence" within the meaning of the policy, Continental is still entitled to summary judgment.

### C. Pollution Exclusion in the USF&G Policy

In the alternative that there was an "accident," and therefore an "occurrence" within the scope of the policy, the parties dispute whether the USF&G policy's pollution exclusion forecloses liability. The USF&G policy specifically excludes bodily injury expected or intended by the insured that would not have occurred but for exposure to pollutants. (ECF No. 1-22 at pp. 68-69). As explained below, the Court would find that the pollution exclusion in USF&G's policy does indeed preclude liability. The policy language is clear and unambiguous.

The toxic tort in the underlying case was the exposure of employees to welding fumes containing hexavalent chromium. Hexavalent chromium is considered to be a toxic substance under a broad range of federal statutory and regulatory standards. *E.g.*, 33 U.S.C. § 1317(a)(1); 40 C.F.R. § 401.15(21); Occupational Exposure to Hexavalent Chromium, 71 Fed. Reg. 10100-01 (Feb. 28, 2006) (codified at 29 C.F.R. pts. 1910, 1915, 1917, 1918, 1926). The critical question

is whether the exposure of the underlying plaintiffs to hexavalent chromium falls within the scope of the pollution exclusion.

The exclusion itself lists a number of ways an employee can be exposed:

> "Bodily injury" or "property damage" which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of 'pollutants' at any time."

(ECF No. 1-22 at p. 68).

As an initial matter, the policy defines "pollutants" as "any solid, liquid, gaseous or thermal irritant or containment, including smoke, vapor, soot, **fumes**, acids, alkalis, chemicals and waste." (ECF No. 1-22 at p. 34) (emphasis added).  There is no question that the hexavalent chromium fumes fall within the exclusion of the policy.

There is, likewise, no question that the means of exposure to the fumes also falls within the pollutants exclusion.  The exposure of the underlying plaintiffs to airborne particles generated by stainless steel welding fumes easily falls within the scope of words like "release," "escape," and "dispersal."  Although these particular terms are not defined in the policy, as in *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 108 (Pa. 1999), these terms plainly encompass how the plaintiffs were contaminated and suffered bodily harm.  Relying on the principle that "words of common usage in an insurance policy are to be construed in their natural, plain and ordinary sense," the Pennsylvania Supreme Court incisively observed in *Madison*, what is common to all of these terms is the element of movement.  *Id.* (citations omitted).  Given that commonality, the exclusion term here applies to a pollutant, like hexavalent chromium, that dispersed into the air above and around the plaintiffs and caused their bodily injuries.

Allegheny attempts to parry the thrust of this reasoning by invoking *Lititz Mut. Ins. Co. v. Steely*, 785 A.2d 975, 981–82 (Pa. 2001), but that case involved lead paint, a medium of

contamination that is easily distinguishable from the fumes at issue here.[6]  As USF&G correctly highlighted, *Madison* is the Pennsylvania Supreme Court's leading "fumes" case within its exclusion policy jurisprudence, so *Madison* is the proper lodestar for this Court's disposition. Whether lead paint cracking and chipping away constitutes "dispersal" may be ambiguous; whether, on the other hand, fumes can "disperse" is not.  Fumes can disperse into an atmosphere in a manner that inflicts adverse, if not deadly effects on human health.  In the alternative that the Court construes USF&G's policy language to encompass what happened in this case, the Court still holds, as a matter of law, that the pollution exclusion in USF&G's policy shields USF&G from liability.

## CONCLUSION

AND NOW, this 16th day of September 2020, IT IS HEREBY ORDERED that Liberty Mutual Fire Insurance Company's and Liberty Mutual Insurance Company's motion for summary judgment (ECF No. 132), Continental Casual Company's motion for summary judgment (ECF No. 136), United States Fidelity & Guaranty Company's motion for summary judgment (ECF No. 140), and Hartford Casualty Insurance Company's and Hartford Accident and Indemnity Company's motion for summary judgment (ECF No. 144) are **GRANTED**.  Allegheny Ludlum, LLC's partial motions for summary judgment (ECF Nos. 148, 150, and 152) are **DENIED**.

BY THE COURT:

WILLIAM S. STICKMAN IV
UNITED STATES DISTRICT JUDGE

---

[6] The issue to be decided was whether the pollution exclusion in a commercial general liability exclusion precluded coverage for injuries allegedly caused by the ingestion and/or inhalation of lead based paint. *Id*. at 976.

19